IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SMART VENT PRODUCTS, INC., | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil Action No. 13-5691 (JBS/KMW) |
| CRAWL SPACE DOOR SYSTEM, INC., *D/B/A CRAWL SPACE DOOR SYSTEMS, INC.*, q | **OPINION** |
| Defendant. | |

APPEARANCES:

Anthony J. DiMarino, Esq.
Emmett S. Collazo, Esq.
A.J. DiMarino P.C.
41 Grove Street
Haddonfield, NJ 08033
     Counsel for Plaintiff

Michael N. Onufrak, Esq.
Siobhan K. Cole, Esq.
White And Williams LLP
1650 Market Street, Suite 1800
Philadelphia, PA 19103
     Counsel for Defendant

**SIMANDLE, Chief Judge:**

## I.   INTRODUCTION

In this unfair competition and trademark infringement action, Plaintiff Smart Vent Products, Inc. (hereinafter, "Plaintiff" or "Smart Vent") advances its position that Defendant Crawl Space Door System, Inc. (hereinafter, "Defendant" or "Crawl Space") "falsely" advertises "patented"

flood vents that meet the requirements of "FEMA, NFIP, and TB-1" (in violation of unfair competition laws), **and** improperly promotes its product through the "use" of the incontestable trademark "SMART VENT" (in violation of federal trademark laws).

In the midst of pre-trial discovery, the Court now confronts two somewhat interconnected motions.  <u>First</u>, Crawl Space moves for partial judgment under Federal Rule of Civil Procedure 12(c) on certain aspects of Smart Vent's unfair competition claim under the Lanham Act, 15 U.S.C. § 1125(a)(1) (hereinafter, "Count I"), the entirety of Smart Vent's unfair competition claims under the common law and the New Jersey Unfair Competition Statute, N.J.S.A. 56:4-1 <u>et</u> <u>seq.</u> (hereinafter, "Counts II and III"), and Smart Vent's claim for trademark infringement under the Lanham Act, 15 U.S.C. § 1114. [<u>See</u> Docket Item 72.]  <u>Second</u>, Smart Vent seeks to enjoin Crawl Space from the continued sale of its "falsely" and/or "misleadingly" advertised flood vents, on the grounds that it will ultimately be successful on its unfair competition claims, and that Crawl Space's tenuous financial position raises a serious question about its ability to satisfy a potential judgment.  [<u>See</u> Docket Item 77.]

The primary issues presented by the pending motions concern the substantive viability of Smart Vent's claims (based upon the allegations of the Complaint), and whether Smart Vent runs the

risk of irreparable (or, noneconomic) harm in the absence of injunctive relief.[1]

For the reasons that follow, Crawl Space's motion for judgment on the pleadings will be granted in part and denied in part, and Smart Vent's motion for injunctive relief will be denied.

## II.  FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.  The NFIP Regulations on Flood Vents

In 1968, Congress enacted the National Flood Insurance Program (hereinafter, the "NFIP") as part of the National Flood Insurance Act, 42 U.S.C. §§ 4001-4131 (hereinafter, the "NFIA"), in order to provide previously unavailable flood insurance protection to property owners in flood-prone areas.  (See Compl.

---

[1] The Court recently addressed, under a summary judgment standard, similar claims in a similar case, see Smart Vent, Inc. v. USA Floodair Vents, Ltd., ___ F. Supp. 3d ___, No. 10-168, 2016 WL 3509325 (D.N.J. June 27, 2016), and partly tracks and borrows from that prior decision, as detailed below.

[2] For purposes of the pending motions, the Court accepts as true the version of events set forth in Plaintiff's Complaint, together with the exhibit attached to the Complaint, documents explicitly relied upon in the Complaint, and matters of public record.  See Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014); see also ACR Energy Partners, LLC v. Polo N. Country Club, Inc., ___ F. Supp. 3d ___, Nos. 15-2677 & 15-5324, 2015 WL 6757574, at *1 n.2 (D.N.J. 2015) (same).  As a result, the Court details, as it must, the specifically relevant provisions of the NFIA, as well as the federal regulation, 44 C.F.R. § 60.3(c)(5), that Smart Vent implicitly relies upon in its Complaint.  (See, e.g., Ex. A to Compl. (attaching Technical Bullet 1-08, which discusses the NFIP regulations for flood vents codified in 44 C.F.R. § 60.3(c)(5)).)

at ¶¶ 9-12.)  More specifically, the NFIA authorized the Federal Emergency Management Agency (hereinafter, "FEMA") "to establish and carry out a [unified and subsidized] national flood insurance program" that would allow "interested persons to purchase insurance" against any losses "arising from any flood occurring in the United States."  42 U.S.C. § 4011(a).  In other words, the NFIA designated FEMA as the administrator of the NFIP program, and vested it with the authority to develop and promulgate regulations relative to flood plain management criteria.  See, e.g., 42 U.S.C. § 4014.

As relevant here, in order to qualify for the federally-subsidized flood insurance, the NFIP regulations enacted by FEMA require, for all new construction and substantial improvements,

> that fully enclosed areas below the lowest floor that are ... subject to flooding ... **be designed to automatically equalize hydrostatic flood forces on exterior walls by allowing for the entry and exit of floodwaters.**

44 C.F.R. § 60.3(c)(5) (emphasis added).  "In other words, the regulations require that foundational spaces (or, the lower levels of dwellings) have flood vents that permit the automatic entry and exit of water."  Smart Vent, Inc., ___ F. Supp. 3d ____, 2016 WL 3509325, at *4 (citing 44 C.F.R. § 60.3(c)(5)). The "designs" for these flood vents must, in turn,

> **either be certified by a registered professional engineer or architect or meet or exceed the following minimum criteria: A minimum of two openings having a**

4

**total net area of not less than one square inch for**
**every square foot of enclosed area subject to flooding**
**shall be provided.**

44 C.F.R. § 60.3(c)(5) (emphasis added).  In that way, the

relevant NFIP regulation requires, on its face, <u>only</u> a

certification of compliance with net area requirements.  <u>See</u> <u>id.</u>

**B.    FEMA Technical Bulletin 1, or TB-2**

As explained in the related <u>Smart Vent v. U.S. Floodair</u>

<u>Vents</u> matter (and as illustrated in Exhibit A to Smart Vent's

Complaint in this litigation),

In its capacity as administrator of the NFIP, in
August 2008, FEMA published a Technical Bulletin,[3]

---

[3] As in the related <u>Smart Vent</u> action, the parties dispute
whether the technical bulletin carries with it the force of law,
with Crawl Space claiming that the bulletin contains
interpretive "'guidance'" (Def.'s Br. at 1, 4-7), while Smart
Vent advances the competing view that FEMA's interpretation of
its own regulations confers (or, creates) "legal requirements."
(Pl.'s Opp'n at 15-16 & n.3 (arguing that FEMA's "administrative
construction" should be afforded "<u>Seminole Rock</u>" or "<u>Auer</u>"
deference).)  Smart Vent's argument, however, misses the mark,
for the reasons expressed in the related matter, namely,
"because TB-1 states, on its face, that it does 'not create
regulations' and instead provides only 'specific guidance for
complying with the requirements of existing NFIP regulations,'"
and then "directs '[u]sers' to consult, if necessary, the <u>actual</u>
legal requirements of the NFIP under 44 C.F.R. § 60.3." <u>Smart</u>
<u>Vent, Inc.</u>, ___ F. Supp. 3d ____, 2016 WL 3509325, at *6 n.9.
"In other words, the guidance provided in TB-1 provides only
FEMA's persuasive interpretation of the NFIP, but stops short of
creating new legal requirements or otherwise heightening the
regulations expressed in 44 C.F.R. § 60.3." <u>Id.</u>  As a result,
Smart Vent cannot point to TB-1 (in this case or the related
<u>Smart Vent</u> action) as a controlling regulation, nor can the
Court find Crawl Space's claims of FEMA and/or NFIP compliance
false or misleading simply because it fails to follow the
<u>nonbinding</u> guidance expressed in TB-1.  <u>See</u> <u>id.</u> (rejecting the
identical argument).  That determination, however, leaves

> "Openings in Foundation Walls and Walls of Enclosures Below Elevated Buildings in Special Flood Hazard Areas in accordance with the" NFIP" (hereinafter, "TB-1"), in an effort to "explain[] the NFIP requirements for flood openings and [to] provide[] guidance for [flood] openings."

Smart Vent, Inc., ___ F. Supp. 3d _____, 2016 WL 3509325, at *5 (internal citations and footnotes omitted).  More specifically, TB-1 explains the certification process for the "two types of flood vents" recognized by the NFIP "for relieving hydrostatic pressure on enclosed spaces: 'non-engineered openings' and 'engineered openings.'"[4]  (Compl. at ¶ 14.)  As relevant here, TB-1 specifies that "engineered openings," as here, may be certified as NFIP-compliant through an "individual certification" or an "Evaluation Report issued by the Internal Code Council Evaluation Services, Inc.," or ICC-ES.  (Id. at ¶¶ 18-19, 21.)

---

unresolved the question of whether Crawl Space "falsely" or "misleadingly" advertised its flood vent as TB-1 compliant—a circumstance that provides the basis, at least in part, for Smart Vent's unfair competition claims.  (See Ex. E to Compl. (reproducing Crawl Space marketing materials that advertise "patented FEMA compliant flood vents" that have been "certified by an engineer to meet FEMA's Technical Bulletin 1 – 2008 requirements").)

[4] An "engineered" flood opening, as here, activates, or opens and shuts, against rising pressure in order to equalize hydrostatic loads.  (Compl. at ¶ 16.)  A "non-engineered" flood opening, by contrast, has no automated mechanism, and must only satisfy the prescriptive requirement that calls for one square inch of net open area for each square foot of enclosed area.  (Id. at ¶ 15.)  In other words, these "non-engineered" flood openings can be as simple as "leaving openings in brickwork" or "omitting blocks from foundational walls."  (Id.)

With respect to the individual certification process, TB-1 explains that 'building designers or owners may ... use unique or individually designed openings or devices.' In such a scenario, a licensed design professional must (1) 'identify the building in which the engineered openings will be installed,' (2) certify that the flood openings 'automatically equalize hydrostatic flood loads,' (3) provide a description of the 'range of flood characteristics' supported by the certification, and (4) note 'the installation requirements or limitations that, if not followed, will void the certification.'

Smart Vent, Inc., ___ F. Supp. 3d ____, 2016 WL 3509325, at *6 (internal citations and footnotes omitted).   The ICC-ES Evaluation Report, by contrast, entails a more rigorous "'technical evaluation[] of documentation submitted by a [flood vent] manufacturer, including technical design reports, certifications and testing that demonstrate ... compliance and performance.'"   (Compl. at ¶ 20 (citation omitted).)

Under either approach to certification, TB-1 encourages "[c]areful attention to compliance with the NFIP regulations for flood openings," and directs consumers to closely inspect the requirements of 44 C.F.R § 60.3, and to "contact their NFIP state coordinator or the appropriate FEMA regional office" for any additional guidance.  (Ex. A to Compl. at 4, 28.)

### C.   Crawl Space's Flood Vent and its Individual Certification Process

Against that regulatory backdrop, Crawl Space produces a "line of 'Engineered Flood Vents,'" which it advertises as compliant with the "'Flood Insurance Requirements of FEMA and

7

the NFIP.'"  (Compl. at ¶¶ 30-31.)  Crawl Space claims, in

particular, that its "patented FEMA compliant flood vents are

certified by an engineer to meet FEMA's Technical Bulletin 1"

requirements, or TB-1.  (Ex. E to Compl.)  In order to

demonstrate that its product complies with NFIP and FEMA

regulations, however, Crawl Space relies upon "individual

certifications," rather than an ICC-ES Evaluation Report.

(Compl. at ¶¶ 32-33.)  More specifically, "engages engineers to

sign non-specific [and almost identical] individual

certifications" that "purport to make Crawl Space Doors' vents

'FEMA Compliant,'"[5] despite "the requirements of TB-1."  (Id. at

¶¶ 34, 36.)  In other words, and as alleged in the Complaint,

Crawl Space "improperly utilizes certifications from engineers

licensed in various states" to buttress its claim of compliance

"with the requirements of FEMA and NFIP."  (Id. at ¶ 56.)

     Beyond that, Crawl Space supposedly [1] "uses the

registered trademark 'SMART VENT' as a 'tag' or 'meta-tag'[6] in

---

[5] Smart Vent, by contrast, "obtained an Evaluation Report from
ICC-ES for its flood vent products."  (Compl. at ¶¶ 47-48; see
also Ex. C to Compl. (reproducing Smart Vent's Evaluation Report
issued by ICC-ES on December 1, 2012).)
[6] A meta-tag "is unseen data embedded in a website read by a
search engine and used to classify a website," in a way that
"increases the probability that a website will be viewed by a
person entering a particular search term into a search engine."
BabyAge.com, Inc. v. Leachco, Inc., No. 07-1600, 2009 WL 82552,
at *8 (M.D. Pa. Jan. 12, 2009) (citation omitted).  Stated
differently, "'meta tags are not visible to the websurfer
although some search engines rely on these tags to help

the coding of its website" to "achieve a higher ranking and profile on Internet search engines ... and to profit [off of] the goodwill and high quality reputation" of Smart Vent, and [2] "fills its marketing materials" with misleading statements concerning, among other things, the contours of Crawl Space's patent protection.  (Id. at ¶¶ 63-74.)

   D.  **Litigation in this District**

   Based upon the Crawl Space's claims of [1] FEMA, NFIP, and TB-1 compliance, [2] a "patented" product, and [3] alleged use of the registered "SMART VENT" trademark, Smart Vent filed this litigation, asserting claims for unfair competition (under the Lanham Act, the New Jersey unfair competition statute, and state common law), negligent misrepresentation, and trademark infringement (again, under the Lanham Act).  (Compl. at ¶¶ 75-131.)

   In the wake of limited discovery and mid-briefing attorney substitution for Crawl Space, the parties' pending motions followed.

---

websurfers find certain websites. Much like the subject index of a card catalog, the meta tags give the websurfer using a search engine a clearer indication of the content of a website.'"  SNA, Inc. v. Array, 51 F. Supp. 2d 554, 568 (E.D. Pa. 1999) (citation omitted), aff'd sub nom., 259 F.3d 717 (3d Cir. 2001)

III. **STANDARDS OF REVIEW APPLICABLE TO THE PARTIES' MOTIONS**

A.   **CRAWL SPACE'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Federal Rule of Civil Procedure 12(c) permits a party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial[.]" FED. R. CIV. P. 12(c). Judgment on the pleadings may be granted only where the moving party "clearly establishes" the absence of any "material issues of fact," and demonstrates that judgment should be entered in its favor "as a matter of law." DiCarlo v. St. Mary Hosp., 530 F.3d 255, 259 (3d Cir. 2008); see also Rosenau v. Unifund Corp., 539 F.3d 218, 221 (3d Cir. 2008) (same).

In applying this standard, however, the Court must "view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party," Jablonski v. Pan Am. World Airways, Inc., 863 F.2d 289, 290 (3d Cir. 1988), and must narrowly confine its inquiry to the allegations of the pleadings and their exhibits, matters of public record, and undisputedly authentic documents that form the basis of the claims.[7] See, e.g., Ettinger & Assocs., LLC v.

---

[7] In other words, courts review Rule 12(c) motions under the same standard that applies to motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6). See, e.g., Spruill v. Gillis, 372 F.3d 218, 223 n.2 (3d Cir. 2004); Turbe v. Gov't of V.I., 938 F.2d 427, 428 (3d Cir. 1991).

Hartford/Twin City Fire Ins. Co., 22 F. Supp. 3d 447, 449 (E.D. Pa. 2014).

**B.   SMART VENT'S MOTION FOR INJUNCTIVE RELIEF**

"The decision to grant or deny ... injunctive relief is an act of equitable discretion by the district court." eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006).  Injunctive relief, however, remains "'an extraordinary remedy never awarded as of right.'"  Groupe SEB USA, Inc. v. Euro-Pro Operating LLC, 774 F.3d 192, 197 (3d Cir. 2014) (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)).

A party seeking a temporary or preliminary injunction must therefore demonstrate: (1) a reasonable likelihood of success on the merits; (2) the prospect of irreparable harm in the absence of an injunction; (3) that this harm would exceed harm to the opposing party; and (4) that the public interest favors the issuance of injunctive relief.  See, e.g., Rogers v. Corbett, 468 F.3d 188, 192 (3d Cir. 2006) (citations omitted); Columbia Gas Transmission, LLC v. 1.092 Acres of Land in Twp. of Woolwich, Gloucester Cnty., N.J., No. 15-208, 2015 WL 389402, at *4 (D.N.J. Jan. 28, 2015) (citation omitted).

Although all four factors guide a court's inquiry, a court will not grant injunctive relief, "regardless of what the equities seem to require," unless the movant successfully demonstrates the first and second factors.  Hoxworth v. Blinder,

11

Robinson & Co., 903 F.2d 186, 197 (3d Cir. 1990) ("[W]e cannot
sustain a preliminary injunction ordered by the district court
where either or both of these prerequisites are absent."); see
also Adams v. Freedom Forge Corp., 204 F.3d 475, 484 (3d Cir.
2000).  In other words, the "moving party's failure to show a
likelihood of success on the merits" or irreparable harm "'must
necessarily result in the denial of a preliminary injunction.'"
Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff, 669
F.3d 359, 366 (3d Cir. 2012) (quoting In re Arthur Treacher's
Franchise Litig., 689 F.2d 1137, 1143 (3d Cir. 1982)) (emphasis
added); see also Morton v. Beyer, 822 F.2d 364, 371 (3d. Cir.
1987) ("[A] failure to show a likelihood of success or a failure
to demonstrate irreparable injury must necessarily result in the
denial of a preliminary injunction.").

IV.  **DISCUSSION CONCERNING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

A.  **Unfair Competition Issues**

Although spread across three different counts (namely,
Counts I, II, and III), Smart Vent's claims for unfair
competition in violation of the Lanham Act, 15 U.S.C. §
1125(a)(1), the New Jersey unfair competition statute, N.J.S.A.
§§ 56:4-1, 4-2, and state common law, hinge upon the central
allegations [1] that Crawl Space made "false and misleading"
claims of compliance with "the requirements of FEMA, NFIP and

TB-1," [2] that it "false[ly] and misleading[ly]" used the
"incontestable registered trademark 'SMART VENT,'" and [3]
"false[ly] and misleading[ly]" marketed its product as
"patented."[8]  (Compl. at ¶¶ 78-82 (raising these allegations in
its unfair competition claim under the Lanham Act), ¶¶ 91-95
(making the same allegations in its unfair competition under the
New Jersey unfair competition statute), ¶¶ 103-107 (making the
*same* allegations in its common law unfair competition claim).)

    In moving for judgment on the pleadings on the unfair
competition aspects of this litigation, Crawl Space generally
argues that Smart Vent's allegations fail to raise a triable
issue.  (See generally Crawl Space's Br. at 9-26; Crawl Space's
Reply at 1-11.)  More specifically, Crawl Space advances the
view that Smart Vent's "'FEMA Complian[ce]," "'Patent
Protection,'" and "'Trademark'" allegations fail, as a matter of
law, because they "are not false or misleading" and/or cannot
raise the necessary specter of consumer confusion.[9]  (Crawl

---

[8] In addition, Smart Vent tethers its unfair competition claims
to the way in which Crawl Space represented the coverage areas
of its flood vents.  (See, e.g., Compl. at ¶ 81.)  Nevertheless,
Crawl Space does not, in the context of the pending motion,
challenge Smart Vent's unfair competition claims to the extent
they concern the net area requirements.  (See Crawl Space's Br.
at 9.)

[9] Although Smart Vent asserts separate claims for false
designation of origin under section 43 of the Lanham Act and
trademark infringement under section 32(1) of the Lanham Act,
the parties agree that the trademark aspects of Smart Vent's
Complaint must be measured against identical standards.  As a

Space's Br. at 9-26.)  Smart Vent claims, by contrast, that its
allegations, accepted as true, include "actionable" support for
its unfair competition claims, particularly at this stage of the
proceedings.  (Smart Vent's Opp'n at 9-25, 34-37.)

Section 43(a) of the Lanham Act governs claims of unfair
competition, and permits a civil action against:

> [a]ny person ... [who] uses ... any false designation
> of origin, false or misleading description of fact, or
> false or misleading representation of fact, which ...
> misrepresents the nature, characteristics, qualities,
> or geographic origin of ... [the] goods, services, or
> commercial activities...

15 U.S.C. § 1125(a)(1)(B).[10]  In other words, section 43(a)
provides "broad protection against various forms of unfair

---

result, the Court addresses those claims together in Part IV.B,
below.  See Chanel, Inc. v. Matos, 133 F. Supp. 3d 678, 684
(D.N.J. 2015) (citation omitted) ("Courts in the Third Circuit
consider claims for trademark infringement and for false
designation of origin under an identical standard.").
[10] The New Jersey unfair competition law states that "[n]o
merchant, firm or corporation shall appropriate for his or their
own use a name, brand, trade-mark, reputation or goodwill of any
maker in whose product such merchant, firm or corporation
deals."  N.J.S.A. § 56:4-1.  Unfair competition under New Jersey
common law, however, constitutes a far more amorphous area,
without any clear catalogue of the acts which amount to unfair
competition.  See, e.g., Interlink Prods. Int'l, Inc. v. F & W
Trading LLC, No. 15-1340, 2016 WL 1260713, at *5 (D.N.J. Mar.
31, 2016).  Relying upon this distinction and the generally
"elastic" nature of the relevant law, Smart Vent argues that its
unfair competition claims under state and common law must be
addressed separately from its unfair competition claim under the
Lanham Act.  (Smart Vent's Opp'n at 34-38.)  Nevertheless,
extant authority explains that "unfair competition claims under
New Jersey statutory and common law" mirror unfair competition
claims "under § 43(a) of the Lanham Act," as here.  Bracco
Diagnostics, Inc. v. Amersham Health, Inc., 627 F. Supp. 2d 384,

competition and false advertising," by specifically prohibiting false or misleading factual statements concerning commercial products, or "acts that would technically qualify as trademark infringement." Presley's Estate v. Russen, 513 F. Supp. 1339, 1376 (D.N.J. 1981) (citations omitted); see also Smart Vent, Inc., ___ F. Supp. 3d ____, 2016 WL 3509325, at *23.  A claim of false or misleading representations requires, in turn, allegations:

> a. that the defendant made a false or misleading statement concerning its product;
>
> b. that the statement caused actual deception or at least created a tendency to deceive a substantial portion of the intended audience;
>
> c. that the deception likely influenced purchasing decisions by consumers;

---

454 (D.N.J. 2009) (citations omitted); see also Buying For The Home, LLC v. Humble Abode, LLC, 459 F. Supp. 2d 310, 317–318 (D.N.J. 2006) (citations omitted) ("Because the elements of a claim of unfair competition under the Lanham Act are the same as for claims of unfair competition and trademark infringement under New Jersey statutory and common law, the Court's analysis below extends to Plaintiff's state law claims as well."); J & J Snack Foods, Corp. v. Earthgrains Co., 220 F. Supp. 2d 358, 374 (D.N.J.2002) ("[T]he elements for a claim for trademark infringement under the Lanham Act are the same as the elements for a claim of unfair competition under the Lanham Act and for claims of trademark infringement and unfair competition under New Jersey statutory and common law...."); Harlem Wizards Entm't Basketball, Inc. v. NBA Properties, Inc., 952 F. Supp. 1084, 1091 (D.N.J. 1997) ("N.J.S.A. 56:4-1 is the statutory equivalent of Section 43(a)(1) of the Lanham Act").  As a result, the Court need not conduct any separate inquiry into the state and/or common law requirements, and the Court's Lanham Act analysis extends instead to the analog state and common law claims.  See Smart Vent, Inc., ___ F. Supp. 3d ____, 2016 WL 3509325, at *23 n.43 (addressing similar unfair competition claims together).

d.   that the advertised goods traveled in interstate
commerce; and

e.   that the statement created a likelihood of injury
to the plaintiff in terms of declining sales,
loss of good will, etc.

See Warner-Lambert Co. v. Breathasure, Inc., 204 F.3d 87, 91-92
(3d Cir. 2000).

### 1. Allegations Concerning FEMA, NFIP, and TB-1 Compliance

Turning first to the allegations of "FEMA compliant flood
vents," Smart Vent's theory hinges, in its entirety, upon Crawl
Space's use of individual engineering certifications, rather
than the ICC-ES Evaluation Report referenced in TB-1.  (Compl.
at ¶¶ 32-38 (listing the factual allegations underpinning Smart
Vent's position that "*Crawl Space Doors' Flood Vents are not
FEMA 'Compliant'*"), ¶¶ 78-79, 91-92, 103-04.)  Crawl Space's
approach to certification, however, comports with the facial
requirements for certification under 44 C.F.R. § 60.3(c)(5),
i.e., the actual binding regulations underpinning the FEMA-
administered NFIP.  See 44 C.F.R. § 60.3(c)(5) (emphasis added)
(explaining that certification requires only that the "designs"
of flood vents "**be certified by a registered professional
engineer or architect or meet or exceed the following minimum
criteria: A minimum of two openings having a total net area of
not less than one square inch for every square foot of enclosed
area subject to flooding shall be provided**").  Indeed, although

16

Smart Vent's Complaint largely attempts to sidestep (or, ignore) these regulatory requirements, its allegations readily admit that Crawl Space engages engineers who certify that the Crawl Space flood vents meet or exceed the minimum net area requirements. (See, e.g., Compl. at ¶¶ 34-35, 44.) In that way, Crawl Space has "clearly establishe[d]" the absence of any "material issues of fact" on the question of whether it falsely or misleadingly advertised its product as "FEMA" and/or "NFIP" compliant, and these aspects of Smart Vent's unfair competition claims (under the Lanham Act, New Jersey law, and the common law) will be dismissed with prejudice (because no amount of pleading supplementation could circumvent the facial requirements of 44 C.F.R. § 60.3(c)(5)). DiCarlo, 530 F.3d at 259.

The Court, however, reaches a different result with respect to Crawl Space's claim of TB-1 compliance, because in seeking judgment on this issue, Crawl Space reaches beyond the pleadings, public records, and undisputed documents that form the fabric of Smart Vent's TB-1 related unfair competition claims. Indeed, in an effort to buttress its position on judgment, Crawl Space looks to far-reaching aspects of its individual certification process and the various iterations of Crawl Space's flood vent advertisements. Such a searching review of facts beyond the pleadings is inappropriate for a Rule

12(c) motion and the narrow allegations by Smart Vent here regarding non-compliance with TB-1 do not fairly open the door of inquiry into every facet of Crawl Space's individual certification process.  See, e.g., Venetec Int'l, Inc. v. Nexus Med., LLC, 541 F. Supp. 2d 612, 617 (D. Del. 2008) (citation omitted) (explaining that "[t]he purpose of judgment on the pleadings is to dispose of claims where the material facts are undisputed and judgment can be entered [only] on the competing pleadings and exhibits thereto, and documents incorporated by reference").

For all of these reasons, Crawl Space's motion for judgment on the pleadings will be granted to the extent it concerns the FEMA and NFIP "compliant" allegations of Smart Vent's unfair competition claims, and denied to the extent it concerns the TB-1 "compliant" allegations of Smart Vent's unfair competition claims.

### 2. Allegations Concerning Patent Protection

Turning next to the allegations of "patent protection," Smart Vent's claims that Crawl Space (falsely) misled consumers into believing that a "utility patent" covers its products, by using the "term 'patented' in the context of its 'patented products' being 'designed to either allow maximum crawl space ventilation, flood protection or to encapsulate the crawl space." (Compl. at ¶ 63.)  In other words, Smart Vent alleges

18

that, by juxtaposing patent ownership with the flood vent's "functional features," Crawl Space falsely suggests that it has patent protection for the "functional aspects of [its] device," despite the fact that its "design [only] patents" cover only the "ornamental" aspects of its flood vents.  (Id. at ¶¶ 65-68.)  In challenging this aspect of Smart Vent's unfair competition claims, Crawl Space asserts, under Federal Circuit law, that "marketplace representations concerning patent protection must be supported" by factual allegations suggesting "bad faith" on the part of "the patent holder."  (Crawl Space's Br. at 16.)

"False or misleading claims of patent protection clearly violate § 43(a)" of the Lanham Act.  Upjohn Co. v. Riahom Corp., 641 F. Supp. 1209, 1223 (D. Del. 1986) (citing John Wright, Inc. v. Casper Corp., 419 F. Supp. 292, 327 (E.D. Pa. 1976) (false claims that penny banks were patented constituted material misrepresentation of quality which tended to deceive ordinary purchaser), modified on other grounds, 587 F.2d 602 (3d Cir. 1978); In re Uranium Antitrust Litig., 473 F. Supp. 393, 408 (N.D. Ill. 1979) (seller who exaggerates scope of patents, giving false impression that it is exclusive source of product, violates § 43(a))).  Nevertheless, when, as in this case, a Lanham Act plaintiff directs a claim against a patent holder for marketplace activity in support of its patent, the plaintiff must, in addition to the five elements outlined above, allege

19

bad faith on the part of the patent holder.  See Enzo Life
Scis., Inc. v. Digene Corp., 295 F. Supp. 2d 424, 427 (D. Del.
2003) (citation omitted) (explaining that, "[w]hen a Lanham Act
claim is asserted against a patent holder for marketplace
activity in support of its patent, that plaintiff is required to
allege that the patent holder acted in bad faith"); Allen v.
Howmedica Leibinger, Inc., 197 F. Supp. 2d 101, 108 (D. Del.
2002), aff'd, 54 F. App'x 697 (Fed. Cir. 2003) (same); Carpenter
Tech. Corp. v. Allegheny Techs. Inc., No. 08-2907, 2011 WL
3652447, at *3 (E.D. Pa. Aug. 19, 2011) (same); Genlyte Thomas
Grp. LLC v. Nat'l Serv. Indus., Inc., 262 F. Supp. 2d 753, 756-
57 (W.D. Ky. 2003) (same).

Indeed, in Zenith Electronics Corp. v. Exzec, Inc., 182
F.3d 1340 (Fed. Cir. 1999), the Court of Appeals for the Federal
Circuit specifically imposed a "bad faith" pleading requirement,
in order to harmonize the purposes and interests of the Lanham
Act and federal patent law, and in light of the fact "a
patentee's statements regarding its patent rights are
conditionally privileged under the patent laws."[11]  Id. at 1353

---

[11] Smart Vent argues that the bad faith pleading requirement
applies only in the context of a patentee's "statements about
potential infringement of its own patent."  (Smart Vent's Opp'n
at 22 (citation omitted).)  On that issue, the Court recognizes
that the Federal Circuit's bad faith requirement in Zenith
emerged mostly through communications to possible infringers
concerning patent rights.  Nevertheless, the Court cannot ignore
that the sweeping language of Zenith captures far more than

(citing Hunter Douglas, Inc. v. Harmonic Design, Inc., 153 F.3d 1318, 1336 (Fed. Cir. 1998) (citations omitted) (explaining the well-recognized proposition that "federal patent law bars the imposition of liability for publicizing a patent in the marketplace unless the plaintiff can show that the patentholder acted in bad faith"), overruled on other grounds by, Midwest Indus., Inc. v. Karavan Trailers, Inc., 175 F.3d 1356 (Fed. Cir. 1999)).

    Applying that simple premise here requires that Smart Vent's unfair competition claims be dismissed to the extent they rest upon Crawl Space's "patent protection claims," because Smart Vent's Complaint contains, as it essentially acknowledges, no allegations of bad faith.  For that reason, Crawl Space's motion for judgment on the pleadings will be granted to the extent it concerns the "patent protection" allegations of Smart Vent's unfair competition claims. The present pleading's omission of an allegation of bad faith may be curable, and its

_____

infringement-oriented statements, and arose specifically in the context of an unfair competition claim under the Lanham Act. Indeed, the Federal Circuit states, in unambiguous terms, that "'federal patent laws bar the imposition of liability for publicizing a patent in the marketplace unless the plaintiff can show that the patentholder acted in bad faith.'"  Zenith, 182 F.3d at 1353 (citation omitted and emphasis added)).  In other words, the Federal Circuit squarely applied its essential premise—the bad faith pleading requirement—to the reference to patent rights (i.e., the existence of a patent) in marketing or advertising materials, the precise circumstance Smart Vent challenges here.

claims in that respect will be dismissed without prejudice, and
with leave to amend within fourteen (14) days.

**B.   Trademark Infringement Issues**

Finally, in the trademark-related aspects of the Complaint,
Smart Vent asserts Lanham Act claims for false designation of
origin and trademark infringement, on account of Crawl Space's
"use" of the "incontestable trademark 'SMART VENT'" in the
coding of its website (as a "tag" or "meta-tag"), and for the
purpose of diverting the attention of Smart Vent customers to
Crawl Space.[12]  (Compl. at ¶¶ 70-74, 80, 93, 105, 124-131.)   In
challenging this final aspect of Smart Vent's Complaint, Crawl
Space takes the position that the use of the "SMART VENT"
trademark as a meta-tag cannot, as a matter of law, establish a
likelihood of consumer confusion, because one non-binding

---

[12] More specifically, Smart Vent alleges that Crawl Space
includes the "registered trademark on multiple websites" through
the following coding (among others) on its website:

> \<title\>Crawl Space Doors - Foundation
> Ventilation Installation\</title\>
>
> \<meta name="keywords"
> content="crawl space doors, vent
> covers, air vents, door fan, shutter fans,
> flood vents, crawlspace door, **smart
> vent**, home humidity, flood and air
> products, air fan installation, foundation
> doors, vent foundation, exhaust window
> fan"\>

(Compl. at ¶ 73 (emphasis in original).)

decision from the Eastern District of Pennsylvania, J.G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding LLC, No. 06-0597, 2007 WL 30115, at *7-*8 (E.D. Pa. Jan. 4, 2007), rejected the notion that a meta-tag could cause confusion.  (Crawl Space's Br. at 20-24.)

In order to state a Lanham Act claim for trademark infringement and/or false designation of origin, as Smart Vent alleges here, it must allege three elements [1] that it has a valid and legally protectable mark, [2] that it owns the mark, and [3] that Crawl Space's use of the mark to identify goods or services causes a likelihood of confusion.  See, e.g., E.A. Sween Co. v. Deli Exp. of Tenafly, LLC, 19 F. Supp. 3d 560, 568 (D.N.J. 2014); see also Coach, Inc. v. Fashion Paradise, LLC, No. 10-4888, 2012 WL 194092, at *2 (D.N.J. Jan. 20, 2012).  In this case, Crawl Space mounts no challenge to the sufficiency of Smart Vent's allegations on the first two elements, and turns its attention instead only to the third element, i.e., likelihood of consumer confusion.  (See, e.g., Crawl Space's Br. at 20-24.)

A "'likelihood of confusion'" exists, in turn, [1] "where 'consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar market'" (i.e., active consumer confusion), Rolls-Royce Motor

23

Cards Ltd. v. Davis, No. 15-0417, 2016 WL 3913640, at *4 (D.N.J. Mar. 11, 2016) (citations omitted), **and/or** [2] where "'an infringer ... use[s] an established mark to create [initial] confusion as to the product's source thereby receiving a free ride on the goodwill of the established mark'" (i.e., initial interest confusion). Urban Outfitters, Inc. v. BCBG Max Azria Grp., Inc., 511 F. Supp. 2d 482, 497 (E.D. Pa. 2007) (citation omitted); see also Checkpoint Sys., Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 292 (3d Cir. 2001) (finding "initial interest confusion" actionable under the Lanham Act).  In other words, initial interest confusion occurs, as relevant here, "'when a consumer is lured to a product by its similarity to a known mark, even though the consumer realizes the true identity and origin of the product before consummating a purchase.'" Checkpoint Sys., Inc., 269 F.3d at 292 (citation omitted).

In this case, and specifically in the narrow context of a motion for judgment on the pleadings, this is not the proper stage of litigation for a likelihood of confusion analysis. "The likelihood of confusion test" requires too "fact-intensive [of an] analysis" for adjudication under a dismissal standard, and on an inquiry confined to the pleadings. Food Scis. Corp. v. Nagler, No. 09-1798, 2010 WL 4226531, at *2 (D.N.J. Oct. 20, 2010) (citing Merck & Co., Inc. v. Mediplan Health Consulting, Inc., 425 F. Supp. 2d 402, 412 (S.D.N.Y. 2006)).  Indeed, for

24

precisely that reason, the Court of Appeals for the Third
Circuit directs district courts to consider an array of fact-
sensitive factors,[13]  see, e.g., Freedom Card, Inc. v. JPMorgan
Chase & Co., 432 F.3d 463, 471 (3d Cir. 2005) (citation omitted)
(enumerating the relevant factors), and Crawl Space has not, on
this record, "clearly establishe[d]" the absence of any factual
issue on the question of confusion.  DiCarlo, 530 F.3d at 259.

Beyond that, numerous courts have, as pointed out by Smart
Vent, found meta-tags infringing under the rubric of initial
interest confusion (see Smart Vent's Opp'n at 30-33 (citing
nearly twenty cases for the proposition that met-tags can, under
the right set of circumstances, suffice to create a likelihood
of confusion)), and against the overwhelming weight of that
authority, the Court cannot find Crawl Space's single citation

---

[13] These factors include, but are not limited to: "(1) the degree
of similarity between the owner's mark and the alleged
infringing mark; (2) the strength of the owner's mark; (3) the
price of the goods and other factors indicative of the care and
attention expected of consumers when making a purchase; (4) the
length of time the defendant has used the mark without evidence
of actual confusion arising; (5) the intent of the defendant in
adopting the mark; (6) the evidence of actual confusion; (7)
whether the goods, though not competing, are marketed through
the same channels of trade and advertised through the same
media; (8) the extent to which the targets of the parties' sales
efforts are the same; (9) the relationship of the goods in the
minds of consumers because of the similarity of function; (10)
other factors suggesting that the consuming public might expect
the prior owner to manufacture a product in the defendant's
market, or that he is likely to expand into that market."
Freedom Card, 432 F.3d at 471 (citation omitted).

to J.G. Wentworth determinative, as a matter of law, on that point. See, e.g., BabyAge.com, Inc. vs. Leacho, Inc., No. 07-1600, 2009 WL 82552, at *13 n.4 (M.D. Pa. Jan. 12, 2009) (citation omitted) (explaining that "a defendant's use of a plaintiff's mark in the metatags of the [defendant's] website" constitutes "one of the most common applications of the [initial interest confusion] doctrine in the internet context); SNA, Inc. v. Array, 51 F. Supp. 2d 554, 562-63 (E.D. Pa. 1999) (finding that defendant's use of meta-tags violated the Lanham Act).

For all of these reasons, Crawl Space's motion for judgment on the pleadings will be denied to the extent it concerns Smart Vent's claims for false designation of origin and trademark infringement. The Court next addresses Smart Vent's separate motion for injunctive relief.

**V. DISCUSSION CONCERNING PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF**

In its motion for preliminary injunctive relief, Smart Vent advances the view that the filings in this case, as well as the "documents filed" in a separate (but related) declaratory judgment action between Crawl Space and its "general liability insurer," suggest that Crawl Space appears "judgment proof." (Smart Vent's Br. at 1.) As a result, Smart Vent seeks to enjoin Crawl Space "from the continued sale of its engineered flood vents," in order to [1] "preserve a remedy for Smart Vent"

by allowing it to "make the sales [Crawl Space] would otherwise make while waiting for a post-judgment injunction," [2] "eliminate the confusion and misinformation that [Crawl Space] spreads in the marketplace for flood vents," [3] "protect consumers from products that do not perform as advertised," and [4] "protect FEMA from exposure to increased flood damage costs" from the Crawl Space vents that fail to perform "as claimed." (Id. at 1-2; see also Smart Vent's Reply at 1-13.)  Crawl Space takes the position, by contrast, that this case turns "entirely [upon] money," and claims that the money-centric nature of this litigation, coupled with Smart Vent's delay in seeking injunctive relief, require that its "quest" for a flood vent "monopoly" by injunction be denied.  (Crawl Space's Opp'n at 1-3.)  For the reasons that follow, Smart Vent's motion for preliminary injunctive relief will be denied for failure to demonstrate irreparable injury in the absence of an injunction.

### A.   Likelihood of Success on the Merits

With respect to the first factor, Smart Vent must demonstrate likelihood of success on the merits of its unfair competition, negligent misrepresentation, and/or trademark infringement claims.  In its injunctive briefing, Smart Vent bases its likelihood of success argument upon its claims for unfair competition under the Lanham Act.  (See Smart Vent's Br. at 18-31.)  Nevertheless, because the Court denied Crawl Space's

motion for judgment on the pleadings in primary part on the unfair competition claims (and as explained above), the Court need not engage in any exhaustive inquiry on Smart Vent's likelihood of success on the merits,[14] and will instead assume (for purposes of the pending motion) that Smart Vent has demonstrated at least a likelihood of ultimate success on its unfair competition claims.  Smart Vent's request for injunctive relief, however, still fails for failure to demonstrate irreparable harm, as now discussed.

**B.  Irreparable Harm**

With respect to the second factor, Smart Vent must demonstrate that it will, in the absence of an injunction, "experience [immediate] harm that cannot adequately be compensated after the fact by monetary damages."  Adams v. Freedom Forge Corp., 204 F.3d 475, 484-85 (3d Cir. 2000) (citation omitted); see Goadby v. Phila. Elec. Co., 639 F.2d 117, 121 (3d Cir. 1981) (noting that irreparable harm only exists when "damages are difficult to ascertain or are inadequate").  In other words, irreparable harm only exists in the event the injury is "of a peculiar nature, [such] that

---

[14] Even more critically, Crawl Space mounted no challenge to Smart Vent's claim that Crawl Space engaged in unfair competition by misrepresenting, or overstating, the coverage areas of its flood vents, and so that claim necessarily survived Crawl Space's dispositive motion practice.  (See, e.g., Compl. at ¶ 81; see Crawl Space's Br. at 9.)

compensation in money damages cannot [alone] atone for it,"
Goadby, 639 F.2d at 121, or where monetary damages would be
inadequate or exceedingly difficult to ascertain.  See In re
Arthur Treacher's Franchise Litig., 689 F.2d 1137, 1146 (3d Cir.
1982).  A purely economic injury, compensable in money, by
contrast, fails to satisfy the irreparable injury requirement.
See Morton v. Beyer, 822 F.2d 364, 371-72 (3d Cir. 1987).

Here, Smart Vent tethers its position on irreparable harm
to the notion that Crawl Space's purportedly weak financial
position risks "the potential erosion or dissipation of a
remedy" against Crawl Space.  (Smart Vent's Reply at 3.)  In
support of this position, Smart Vent points to two
circumstances: [1] the fact that prior counsel for Crawl Space,
Rivkin Radler, LLP, withdrew as counsel "based on [Crawl
Space's] inability to pay the firm's legal fees" (id. at 4; see
also Smart Vent's Br. at 33), and [2] because, on February 22,
2016, the Eastern District of Virginia relieved the insurer of
"its duty to defend and indemnify [Crawl Space] in the instant
law suit."[15]  (Smart Vent's Br. at 34-35 (arguing that "the

---

[15] Smart Vent also argues that, in the absence of an injunction,
it "will be irreparably injured in terms of loss of monetary
recovery, loss of sales, loss of market share in the engineered
flood vent market, loss of goodwill, and [claims that] it will
be required to continue to provide corrective advertising."
(Smart Vent's Br. at 36-37.)  Nevertheless, Smart Vent points to
no evidence of lost sales, business, or the like, and instead
looks only to the self-serving and unsupported affidavit of its

conclusion that [Crawl Space] will not be able to satisfy a monetary judgment entered against it *after* [it] has lost its insurance coverage seems inescapable").).

Nevertheless, "'[m]ere assertions of dire economic effects cannot, without some concrete proof, meet the irreparable harm standard,'" Drabbant Enters., Inc. v. Great Atl. & Pac. Tea Co., 688 F. Supp. 1567, 1574 (D. Del. 1988) (citation omitted), and Smart Vent's position here sounds solely in speculation and has little if any evidentiary footing.  (See, e.g., Smart Vent's Br. at 32-37 (arguing, with little if any evidence, that these two factual circumstances necessarily reflect Crawl Space's inability to weather an ultimate judgment in this action); Smart Vent's Reply at 1-5 (same).)  Beyond that, Smart Vent's position runs directly counter to the current traction in this litigation—and specifically, the fact that Crawl Space continues to operate and defend itself in this litigation, despite the declaratory judgment in the insurance coverage action and Crawl Space's earlier issues with its prior counsel.  In that way,

---

Vice President, who states, without explanation or qualifying detail, that Smart Vent "loses sales" to Crawl Space.  (Little Dec. at ¶¶ 18, 22-23.)  Given the woefully undeveloped nature of Smart Vent's argument, such as supplying a factual basis for the claim of lost sales, the Court need not address it any further. Quad/Tech, Inc. v. Q.I. Press Controls B.V., 701 F. Supp. 2d 644, 657 (E.D. Pa. 2010) (rejecting a similar argument, out of hand, for lack of evidence), aff'd, 413 F. App'x 278 (Fed. Cir. 2011).

Smart Vent's claimed harm presents little more than purely economic and reparable loss, and the availability (on this record) of adequate monetary damages belies, on its own, "a claim of irreparable injury." Frank's GMC Truck Ctr., Inc. v. G.M.C., 847 F.2d 100, 102-03 (3d Cir. 1988)

Finally, the Court must note that Smart Vent's delay in seeking injunctive relief undercuts the urgency that forms the cornerstone of preliminary injunctive relief—and indeed, indicates a lack of immediacy.  More specifically, Smart Vent filed the pending motion on **April 28, 2016**, but in seeking injunctive relief, cites to events that occurred in the **Fall of 2015** (when Rivkin Radler, LLP moved to withdraw and current counsel, White & Williams LLP entered its appearance) and **February of 2016** (when the insurance coverage action concluded). (See, e.g., Smart Vent's Br. at 16-17 (providing a chronicle of events).)  In other words, Smart Vent sought the extraordinary relief it now seeks at best two months and at worst seven months after the events that form the lynchpin of its request for an injunction.[16]  A delay of that magnitude, in turn, "knocks the

---

[16] In an effort to explain its own delay, Smart Vent points to Local Civil Rule 65.1 and the pendency of settlement discussions in December of 2015.  (See Smart Vent's Br. at 35-36.)  Neither of those issues, however, negates Smart Vent's delay.  Indeed, although Local Civil Rule 65.1 allows a party to seek a preliminary injunction "during the pendency of the action," any delay in seeking such relief still necessarily informs the irreparable harm inquiry.  See Pharmacia Corp., 201 F. Supp. 2d

bottom out of any claim of immediate and irreparable harm."
Pharmacia Corp. v. Alcon Labs., Inc., 201 F. Supp. 2d 335, 383–
84 (D.N.J. 2002) (citations omitted); see also New Dana Perfumes
v. The Disney Store, Inc., 131 F. Supp. 2d 616, 630 (M.D. Pa.
2001) (delay of two months in sending demand letter and five
months in moving for relief precludes preliminary injunction);
Warner Lambert Co. v. McCrory's Corp., 718 F. Supp. 389, 393–95
(D.N.J. 1989) (finding that a seven-month delay "conclusively
refute[d]" a claim of irreparable harm).

For all of these reasons, the Court finds that Smart Vent
has failed to demonstrate that it will suffer immediate and
irreparable harm in the absence of an injunction, and its motion
for injunctive relief must, accordingly, be denied.[17]   See P.C.

---

at 383-84.  Similarly, even if the Court credited Smart Vent's
effort to attribute its delay to the pendency of settlement
discussions, it still waited over four months after those
discussions collapsed to seek injunctive relief.  Even more
critically, the parties' settlement efforts call into question
Smart Vent's overall position on the limited financial
wherewithal of Crawl Space (because Smart Vent would,
presumably, not engage in settlement discussions with an empty
purse).

[17] Because Smart Vent has failed to demonstrate irreparable harm,
the Court need not balance the equities nor address the public
interest.  See, e.g., Turner v. N.J. State Police, No. 08-5163,
2015 WL 1850001, at *6 (D.N.J. Apr. 22, 2015) (foregoing any
discussion of likelihood of success on the merits, the balance
of harms, and the public interest, where the plaintiff failed to
demonstrate irreparable harm).  Nevertheless, even if the Court
proceeded with the remainder of the analysis, the result would
remain unchanged, because the relative equities rest in
equipoise (because Smart Vent's flood vent business appears
ongoing, while an injunction may well drive Crawl Space out of

*Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) (citation omitted) (stating that injunctive relief is "inappropriate," unless the movant establishes "every element in its favor"); *Hoxworth*, 903 F.2d at 197 (generally providing that an injunction cannot issue absent a showing of <u>both</u> a likelihood of success on the merits <u>and</u> irreparable harm); *Turner*, 2015 WL 1850001, at *6 (same).

## VI.   CONCLUSION

For the reasons explained above, Crawl Space's motion for judgment on the pleadings will be granted in part and denied in part, and Smart Vent's motion for a preliminary injunction will be denied.


**August 15, 2016**                  **s/ Jerome B. Simandle**
Date                                  JEROME B. SIMANDLE
                                      Chief U.S. District Judge

---

business), as does the public interest (because no determination has been made on the accuracy of Crawl Space's advertisements, and stopping the sale of competitive flood vents without such a determination would arguably run contrary to the public's interest in the availability of lower-cost flood vents).  The harm incurred from a preliminary injunction that effectively puts Crawl Space out of business before adjudication of the merits would have to be justified by strong showings of likely success and irreparable harm, which are missing.  And for those reasons too, Smart Vent's request for injunctive relief must be denied.