## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

SMART VENT PRODUCTS, INC.,  :
                            :

      Plaintiff,      :    CIVIL ACTION NO.:
                            :

      v.              :
                            :

CRAWL SPACE DOOR      :    **JURY TRIAL DEMANDED**
SYSTEM INC., d/b/ a CRAWL  :
SPACE DOOR SYSTEMS, INC.  :    ELECTRONICALLY FILED
                            :

      Defendant.     :

## FIRST AMENDED COMPLAINT

COMES NOW Plaintiff, Smart Vent Products, Inc. ("Smart Vent"), by and

through its undersigned counsel, and for its Amended Complaint against Defendant,

Crawl Space Door System Inc. d/b/a Crawl Space Door Systems, Inc. ("Crawl Space

Doors"), alleges as follows:[1]

---

1    Smart Vent Products, Inc. files this amended complaint consistent with the
Order entered by this Court on August 16, 2016 allowing Smart Vent to amend its
unfair competition claims to the extent they concern allegations of patent
protection.  Docket Item 95.  The new allegations are found in paragraphs 70 – 75,
89, 103 and 116.  All other content remains unchanged, with the exception of new
address for counsel.

## PARTIES

1.      Smart Vent is a corporation organized under the laws of the State of Florida, with a principal place of business at 430 Andbro Drive, Unit 1, Pitman, New Jersey, 08071.

2.      Crawl Space Doors is a corporation organized under the laws of the State of Virginia, with a principal place of business at 3700 Shore Drive #101, Virginia Beach, Virginia 23455.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this Complaint raises claims arising under the laws of the United States, including 28 U.S.C. § 1338 and 15 U.S.C. §§ 1121 and 1125.

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because Crawl Space Doors is deemed to reside in this judicial district and because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

## FACTS

5.      Smart Vent sells flood mitigation and ventilation systems in the form of foundation flood vents.

6.      The purpose of these vents is to allow flood waters to flow freely into and out of the lower level of structures.   If water pressure were to build up on either

2

the interior or exterior of foundation walls, in, for example, a flood situation, the foundation walls could be compromised and significant property damage could occur as a result, such as buckling and collapsing of a foundation wall:



7.      Crawl Space Doors is in the business of selling, among other items, flood vents.

8.      Crawl Space Doors competes with Smart Vent for consumers of flood vent products.

### *Requirements for Engineered Flood Vents*

9.      With the passage of the National Flood Insurance Act of 1968, the United States Congress established the National Flood Insurance Program ("NFIP"). The NFIP is a program of the federal government which enables property owners in participating communities to purchase flood insurance in exchange for State and

community floodplain management regulations that seek to reduce future flood damage.

10.     The NFIP is administered by the Federal Emergency Management Agency ("FEMA").

11.     FEMA works closely with private insurance companies to offer flood insurance to property owners.   In order to qualify for flood insurance, a community must join the NFIP and agree to enforce sound floodplain management standards.

12.     One of the important objectives of the NFIP is the protection of buildings that are constructed in special flood hazard areas ("SFHAs") from damage caused by flood forces.   In support of this objective, the NFIP regulations include minimum building design criteria that apply to new construction, repair of substantially damaged buildings, and substantial improvement of existing buildings in SFHAs.   Some of these requirements are set forth in the document "Openings in Foundation Walls and Walls of Enclosures," FEMA Technical Bulletin 1, August 2008 (hereafter "TB-1"). (Ex. A.)

13.     TB-1, as amended, requires certain minimum building design criteria, including the use of flood vents for certain properties in flood zone areas.

14.     For flood vents to meet the requirements of TB-1, NFIP recognizes two types of flood vents for relieving hydrostatic pressures on enclosed spaces: "non-engineered openings" and "engineered openings."

15.     Under TB-1, as amended, a "non-engineered opening" is an opening in a structure's wall which allows flood waters to flow inside a structure. These non-engineered openings must meet NFIP's requirement that 1 square inch of net open area exists in the structure's walls for every 1 square foot of enclosed area. As examples, leaving openings in brickwork, or omitting blocks from foundation walls, may constitute "non-engineered openings." Additional NFIP regulations exist regarding non-engineered openings.

16.     Under TB-1, as amended, "engineered openings" are specifically defined as:

> …an opening that is designed and certified by a registered design professional as meeting certain performance characteristics related to providing automatic entry and exit of flood waters; the certification requirement may be satisfied by an individual certification or issuance of an Evaluation Report by the ICC Evaluation Service, Inc. …."  Ex. A. (TB-1 at 31).

17.     Engineered openings or devices may be accepted by local officials as an alternative to non-engineered openings provided the designs are certified.   Ex. A (TB-1 at 25).

18.     Engineered openings can be certified in one of two methods.

19.     For the first option, the certification can be an Evaluation Report issued by the International Code Council Evaluation Services, Inc. (ICC-ES).   The ICC-ES is a subsidiary of the International Code Council ("ICC").

5

20.     As set forth in TB-1, "Evaluation Reports are issued only after the ICC-ES performs technical evaluations of documentation submitted by a manufacturer, including technical design reports, certifications and testing that demonstrate current compliance and performance."   Ex. A. (TB-1 at 25).

21.     For the second option, the certification can be an individual certification.

22.     Individual certifications are for individually designed openings.

23.     Individual certifications must be prepared by a registered design professional and must contain certain information, including, but not limited to:

(a) information about the design professional, his or her license, signature, and applied seal;

(b) a statement certifying that the openings are designed to automatically equalize hydrostatic flood loads on exterior walls by allowing the automatic entry and exit of floodwaters in accordance with the design requirements of Engineered openings as set forth in [ASCE 24-05], which is referenced by the International Building Code;

(c) a description of the range of flood characteristics tested or computed for which the certification is valid, such as rates of rise and fall of floodwaters; and

(d) a description of the installation requirements or limitations that, if not followed, will void the certification.

Ex. A. (TB-1 at 25).

24.     On October 23, 2008, FEMA issued NFIP Underwriting Bulletin W-08086, which further clarified, among other items, the requirements for the individual certifications to be used for engineered openings designed for installation in a specific building:

> For engineered openings designed for installation in a specific building, a copy of the certification is required…**The original certification** statement must include the design professional's name, title, address, type of license, license number, the state in which the license was issued, and the signature and applied seal of the certifying registered design professional.   In addition, **this certification shall identify the building in which the engineered openings will be installed** and it shall address the following:
>
> (a) a statement certifying that the openings are designed to automatically equalize hydrostatic flood loads on exterior walls by allowing the automatic entry and exit of floodwaters;
>
> (b) description of the range of flood characteristics tested or computed for which the certification is valid, such as rates of rise and fall of floodwaters; and
>
> (c) description of the installation requirements or limitations that, if not followed, will void the certification….

(Emphasis added.)

See Ex. B. (Memorandum W-08086, October 23, 2008, clarifying TB-1 requirements.)

7

25.     Crawl Space Doors was, upon information and belief, formed on or about March 27, 1998.

26.     When it was formed, Crawl Space Doors sold products that provided access to crawl spaces in homes.

27.     At that time, Crawl Space Doors began offering for sale a door which was made out of plastic.

28.     Crawl Space Doors then began to develop its product line further. These steps included adding screens and fans to the plastic doors for the purpose of providing ventilation to crawl spaces.

29.     Subsequently, Crawl Space Doors began advertising these ventilated doors as "flood vents."

30.     Today, Crawl Space Doors sells a product line of "Engineered Flood Vents."

31.     Crawl Space Doors markets its flood vents and advertises that its flood vents are "FEMA compliant" and that its flood vents conform to the "Flood Insurance requirements of FEMA and the NFIP."

### *Crawl Space Doors' Flood Vents are not FEMA "Compliant"*

32.     Crawl Space Doors has not obtained an Evaluation Report issued by the ICC-ES concerning the flood vents that it sells.

8

33.     Crawl Space Doors cannot use an individual certification to meet the requirements set forth in TB-1 because the individual certifications are specifically tailored for individually designed openings, rather than mass produced flood vents, such as those sold by Crawl Space Doors.

34.     Despite knowledge of TB-1 regulations, Crawl Space Doors engages engineers to sign non-specific individual certifications in 14 states, which certifications purport to make Crawl Space Doors' vents "FEMA Compliant."

35.     Crawl Space Doors has hired engineers to sign and place state-registration seals on these "Engineered Flood Vent Certification" documents. On information and belief, all such documents are almost identical but for the signature and identification information at the bottom of the page.

36.     While Crawl Space Doors attempts to market its products as "FEMA Compliant," none of Crawl Space Doors' certifications are "original," and none of the certifications "identify the building in which the engineered openings will be installed," contrary to the requirements of TB-1. Ex. A. (TB-1 at 24).

37.     Crawl Space Doors markets itself and its President as experts in the field of flood risk prevention and FEMA regulations regarding NFIP insurance and NFIP compliance.

38.      Despite not complying with FEMA's NFIP and TB-1 regulations, as well as ASCE and IBC requirements, Crawl Space Doors fills its marketing

9

materials with meta-tags, comments on its credentials, and misleading statements that it provides the "best products in the market," which "allow maximum crawl space ventilation [and] flood protection," and that the "patented FEMA compliant flood vents are certified by an engineer to meet FEMA's TB-1 2008 requirements." Crawl Space Doors further states that the products are "unparalleled by industry standards."

### Crawl Space Doors Overstates its Flood Vents' Coverage Areas

39.     TB-1 specifies how certified design professionals must determine performance criteria for engineered flood openings. TB-1 includes an equation, which is used to determine how much enclosed space under a structure that each flood vent "services."

> $A_o = 0.033 \, [1/c] \, R \, A_e$, where "R" is a worst case rate of rise and fall of flooding waters; $A_o$ is the "net open area" of the flood vent, and $A_e$ is the enclosed area (in square feet), that the flood vent can competently service. The flood vent services, or protects, the enclosed area by allowing sufficient amounts of flooding water to pass through the vent and into the interior of the structure, in effect flooding the building or structure.

Ex. A. (TB-1 at 27).

40.     In the equation above, $A_o$ is the net open area of the engineered vents and $A_e$ is the amount of enclosed space within the structure that can be serviced by a specific engineered vent.

41.     As set forth in the equation above, if a vent has a larger net open area, i.e. a larger Ao value, that vent will service a larger area of enclosed space in a building, i.e. the value of Ae will also be larger.

42.     Crawl Space Doors significantly overstates the net open area of its vents.

43.     By significantly overstating the net open area of its flood vents, Crawl Space Doors significantly overstates the amount of enclosed space each vent can serve.

44.     For example, Crawl Space Doors offers flood vent model 816CS with a "certification" that states that that model has a net open area of 105 square inches, and services an enclosed area of 205 square feet.

45.     Crawl Space Doors bases this calculation on a misleading and incorrect determination of net open area of the 8" x 16" flood vent.

46.     Smart Vent also has a flood vent product which measures 8" x 16".

47.     Smart Vent has obtained an Evaluation Report from ICC-ES for its flood vent products.

48.     ICC-ES evaluated this flood vent and determined that it services 200 square feet of enclosed space. See Ex.C (ICC-ES Evaluation Report, ESR-2074, reissued December 1, 2012).

49.     By, among other items, improperly inflating the net open area of its flood vents, Crawl Space Doors advertises that its 8" x 16" flood vent product serves more enclosed space than the Smart Vent 8" x 16" flood vent.

50.     Crawl Space Doors also sells its 8" x 16" flood vent at a price less than Smart Vent's 8" x 16" flood vent.

51.     The consequence of Crawl Space Doors' overstatement of the area properly serviced by a single flood vent is that the architects, consumers, and builders are misled, and do not know that more Crawl Space Door flood vents are needed to service a given enclosed area.

52.     One of Crawl Space Doors' competitors challenged the accuracy of Crawl Space Doors' engineering certificates.

53.     A third-party determined that the total enclosed area serviceable by Crawl Space Doors' model FV 816 flood vent was substantially and materially overstated by purporting to service twice as much enclosed area as it should. That is, the proper calculations resulted in a total enclosed area of approximately 111 square-feet that could be serviced per vent, and not 230 square feet then claimed by Crawl Space Doors. See Ex. D (L. Joseph letter dated July 18, 2011.)

54.     On information and belief, after receiving this letter, Crawl Space Doors changed its certifications to state that model FV 816 services 205 square feet of enclosed area, which continues to substantially and materially overstate the

enclosed serviceable area by 94 square feet more than the independent evaluator.

55.     On information and belief Crawl Space Doors continues to overstate the area serviced by its vents.

56.     As referenced above, Crawl Space Doors improperly utilizes certifications from engineers licensed in various states to support its claim that its flood vent products are compliant with the requirements of FEMA and NFIP.

57.     The certifications provided by these engineers include statements by the engineers that they did not personally calculate the net open area of the engineered vents themselves.

58.     These certifications also include inconsistencies concerning who provided and/or determined the net open area of the flood vents.

59.     For example, the certification for the State of New Jersey indicates that the engineer utilized the "The net area of openings (Ao) as provided by the manufacturer".

60.     The certification for the State of Alabama, however, indicates that "[t]he actual vent opening measurements were determined and certified by Mr. Christopher Mark Looney [sic]."

61.     The certification for the State of Alabama also provides that the engineer utilized "[t]he net area of openings (Ao) as provided by the manufacturer."

62.    The Certification for the Commonwealth of Virginia is signed by an engineer named Christopher Mark Loney.   Mr. Loney indicates that he utilized "[t]he net area of openings (Ao) as provided by the manufacturer."   He does not state that he determined and certified the "actual vent opening measurements".

### *Crawl Space Doors' misleading statements regarding patent protection*

63.    Crawl Space Doors' marketing statements falsely assert that its products are protected by a utility patent by use of the term "patented" in the context of its "patented products" being "designed to either allow maximum crawl space ventilation, flood protection or to encapsulate the crawl space. Our patented FEMA compliant flood vents are certified by an engineer to meet FEMA's [TB-1] requirements." (emphasis added) See Ex. E. (Flyer).

64.    By asserting ownership of a patent for flood vents in the context of "designs" for functional features that "allow" "ventilation" and "protection," and which "encapsulate," and by immediately thereafter stating "This technology is unparalleled by industry standards," Crawl Space Doors misleads consumers into believing there is a functional link between its "patents" and its products, namely, a utility patent:

> Crawl Space Door Systems has engineered, designed, manufactured and patented a unique selection of crawl space doors, air vents, flood vents, fans and vent covers.

> These patented products are designed to either allow maximum crawl space ventilation, flood protection or to encapsulate the crawl space. Our patented FEMA compliant flood vents are certified by an engineer to meet FEMA's Technical Bulletin 1-2008 requirements.
>
> Our products are engineered as a solution …This technology is unparalleled by industry standards.

See Ex. E.

65.    The word "patented" is used three times above, and based on the context of the terms "engineered" and "designed to" in close proximity to "patented," industry professionals and consumers would understand this to correspond to utility patents, yet the patents owned by Crawl Space Doors are design patents.

66.    Design patents, by statute, and as stated on the U.S. Patent and Trademark Office's design patent application form, are limited to ornamental and non-functional designs, and cannot protect functional aspects of a device.

> *DESIGN V. UTILITY: A "design patent" protects an article's ornamental appearance (e.g., the way an article looks) (35 U.S. C. 171 ), while a "utility patent" protects the way an article is used and works (35 U.S.C. 101). The ornamental appearance of an article includes its shape/configuration or surface ornamentation upon the article, or both.*

U.S. Patent and Trademark Office's form PTO/SB/04-05.

67.    On information and belief, Crawl Space Doors is referring to design patents US D583042 S1 ("Crawlspace FEMA flood louver") and US D448489 S1

15

("Crawl space door and frame with interior flange") when marketing its "technology" as being protected by patents.

68.     Crawl Space Doors' design patents acknowledge, in the sole claims for each, that the design patents are limited to ornamental designs. *See* U.S. D583042 S1 (claiming "The ornamental design for a crawlspace FEMA flood louver, as shown."); US D448489 S1 (claiming "The ornamental design for a crawl space door and frame with interior flange, as shown and described.").

69.     Crawl Space Doors misrepresents its products as possessing an "unparalleled" "technology," when it is merely protected by the U.S. government's issuance of design patents.

70.     William G. Sykes is a shareholder of Crawl Space Doors.

71.     Mr. Sykes is also the President of Crawl Space Doors.

72.     Mr. Sykes is an attorney licensed to practice law in the Commonwealth of Virginia.

73.     Mr. Sykes is also an attorney who has been licensed to practice before the United States Patent and Trademark Office ("USPTO") since 2002.   His USPTO registration number is 50,704.

74.     Among other items, Mr. Sykes prepared the Crawl Space Doors advertisement attached as Exhibit E.

75.     As a Registered Patent Attorney, Mr. Sykes knows the difference between a utility patent and design patent.

### Crawl Space Doors Used
### Smart Vent's Incontestable Trademark in Internet Marketing

76.     "SMART VENT" is a trademark owned by Smart Vent, on the United States Patent and Trademark Office's Principle Register, under federal registration number 2,464,134. The mark has been registered since 2001, was renewed in 2011, and is now incontestable under 15 U.S.C. § 1065. See Exh. F.

77.     Upon information and belief, since at least 2012, Crawl Space Doors has used the incontestable trademark "SMART VENT" in connection with its Internet marketing, to capture Smart Vent's good will and reputation, to drive more traffic to its website, to suggest endorsement by Smart Vent, and/or to falsely associate itself with quality products produced by Smart Vent.

78.     Crawl Space Doors' marketing efforts include use of a website, www.crawlspacedoors.com, which website includes a blog, or online journal that is used to direct readers towards purchasing Crawl Space Doors' products.

79.     Crawl Space Doors intentionally uses the registered trademark "SMART VENT" as a "tag" and a "meta-tag" in the coding of its website in order to (i) achieve a higher ranking and profile on Internet search engines, and (ii) to profit

from the goodwill and high quality reputation of its competitor, Smart Vent, and so

include the registered trademark on multiple websites, at least the following:

> &lt;title&gt;Crawl Space Doors - Foundation
> Ventilation Installation&lt;/title&gt;
>
> &lt;meta name="keywords"
> content="crawl space doors, vent
> covers, air vents, door fan, shutter fans,
> flood vents, crawlspace door, **smart
> vent**, home humidity, flood and air
> products, air fan installation, foundation
> doors, vent foundation, exhaust window
> fan"&gt;

80.     Crawl Space Doors' use and infringement of "SMART VENT" injures

Smart Vent's reputation, including by the capture of Smart Vent's goodwill and

Smart Vent's reputational investments made in connection with the mark.

## CAUSES OF ACTION

### Count I
### Unfair Competition, 15 U.S.C. § 1125

81.     Smart Vent repeats and incorporates by reference the allegations made

in the foregoing paragraphs of this Complaint as if fully set forth herein.

82.     This Count is for unfair competition and arises under the Lanham Act,

15 U.S.C. §§ 1051-1127 in general, and 15 U.S.C. § 1125(a)(1) in particular.

83.     Crawl Space Doors' acts of unfair competition include, but are not

limited to, the following.

84.     Crawl Space Doors has stated that its flood vents meet the requirements of FEMA, NFIP and TB-1.

85.     The statement that its flood vents meet the requirements of FEMA, NFIP and TB-1 are false and misleading statements about Crawl Space Doors' flood vent products.

86.     The use of the incontestable registered trademark "SMART VENT" in connection with marketing of its products, is false and misleading.

87.     Crawl Space Doors has made false and misleading statements which misrepresent the amount of area that their flood vents will service under NFIP regulations.

88.     Crawl Space Doors has made false and misleading statements suggesting that it has utility patents when Crawl Space Doors owns design patents.

89.     When Crawl Space Doors made these false and misleading statements suggesting that it has utility patents when Crawl Space Doors owns only design patents, Crawl Space Doors was acting in bad faith.

90.     These false statements about Crawl Space Doors' products deceive and are likely to deceive a substantial portion of the purchasers of flood vents.

91.     Crawl Space Doors' aforementioned statements are material in that the statements influence the purchasing decisions of consumers and construction professionals.

19

92.     As a result of Crawl Space Doors' actions and statements, there is actual deception of the intended audience, namely, the consumers of the flood vents and construction professionals.

93.     Crawl Space Doors' advertised goods, namely, the flood vents, have traveled in interstate commerce.

94.     Smart Vent has been injured as a result of Crawl Space Doors' acts complained of herein, and there is a likelihood of continued injury to Smart Vent as result of Crawl Space Doors' acts complained of herein.

## Count II
## Unfair Competition, N.J.S.A. §§ 56:4-1 AND 56:4-2

95.     Smart Vent repeats and incorporates by reference the allegations made in the foregoing paragraphs of this Complaint as if fully set forth herein.

96.     This Count is for unfair competition and arises under the New Jersey Unfair Competition Statute, N.J.S.A. §§ 56:4-1 *et seq*.

97.     Crawl Space Doors' acts of unfair competition include, but are not limited to, the following.

98.     Crawl Space Doors has stated that its flood vents meet the requirements of FEMA, NFIP and TB-1.

99.     The statement that its flood vents meet the requirements of FEMA, NFIP and TB-1 are false and misleading statements about Crawl Space Doors' flood

20

vent products.

100.   The use of the incontestable registered trademark "SMART VENT" in connection with marketing of its products, is false and misleading.

101.   Crawl Space Doors has made false and misleading statements which misrepresent the amount of area that their flood vents will service under NFIP regulations.

102.   Crawl Space Doors has made false and misleading statements suggesting that it has utility patents when Crawl Space Doors owns design patents.

103.   When Crawl Space Doors made these false and misleading statements suggesting that it has utility patents when Crawl Space Doors owns only design patents, Crawl Space Doors was acting in bad faith.

104.   These false statements about Crawl Space Doors' products deceive and are likely to deceive a substantial portion of the purchasers of flood vents.

105.   Crawl Space Doors' aforementioned statements are material in that the statements influence the purchasing decisions of consumers and consruction professionals.

106.   As a direct and proximate result of Crawl Space Doors' actions and statements, there is actual deception of the intended audience, namely, the consumers of the flood vents.

107. Crawl Space Doors' advertised goods, namely, the flood vents, have traveled in interstate commerce.

108. Smart Vent has been injured as the a result of Crawl Space Doors' acts complained of herein, and there is a likelihood of continued injury to Smart Vent as result of Crawl Space Doors' acts complained of herein.

## Count III
## Unfair Competition, Common Law

109. Smart Vent repeats and incorporates by reference the allegations made in the foregoing paragraphs of this Complaint as if fully set forth herein.

110. Crawl Space Doors' acts of unfair competition include, but are not limited to, the following.

111. Crawl Space Doors has stated that its flood vents meet the requirements of FEMA, NFIP and TB-1.

112. The statement that its flood vents meet the requirements of FEMA, NFIP and TB-1 are false and misleading statements about Crawl Space Doors' flood vent products.

113. The use of the incontestable registered trademark "SMART VENT" in connection with marketing of its products, is false and misleading.

114.   Crawl Space Doors' has made false and misleading statements which misrepresent the amount of area that their flood vents will service under NFIP regulations.

115.   Crawl Space Doors has made false and misleading statements suggesting that it has utility patents when Crawl Space Doors owns design patents.

116.   When Crawl Space Doors made these false and misleading statements suggesting that it has utility patents when Crawl Space Doors owns only design patents, Crawl Space Doors was acting in bad faith.

117.   These false statements about Crawl Space Doors' products deceive and are likely to deceive a substantial portion of the purchasers of flood vents.

118.   Crawl Space Doors' aforementioned statements are material in that the statements influence the purchasing decisions of consumers.

119.   As a result of Crawl Space Doors' actions and statements, there is actual deception of the intended audience, namely, the consumers of the flood vents.

120.   Smart Vent has been injured as a result of Crawl Space Doors' acts complained of herein, and there is a likelihood of continued injury to Smart Vent as result of Crawl Space Doors' acts complained of herein.

**Count IV**
**Negligent Misrepresentation**

121.    Smart Vent repeats and incorporates by reference the allegations made in the foregoing paragraphs of this Complaint as if fully set forth herein.

122.    Crawl Space Doors has a duty to provide non-false and non-deceptive information regarding its products.

123.    Crawl Space Doors has breached this duty by providing false information.

124.    Crawl Space Doors has stated that its flood vents meet the requirements of FEMA, NFIP and TB-1.

125.    The statement that its flood vents meet the requirements of FEMA, NFIP and TB-1 are false and misleading statements about Crawl Space Doors' flood vent products.

126.    The use of the incontestable registered trademark "SMART VENT" in connection with marketing of its products, is false and misleading.

127.    Crawl Space Doors has made false and misleading statements which misrepresent the amount of area that its flood vents will service under NFIP regulations.

128.    Crawl Space Doors has made false and misleading statements suggesting that it has utility patents when Crawl Space Doors owns design patents.

129.   These false statements about Crawl Space Doors' products deceive and are likely to deceive a substantial portion of the purchasers of flood vents.

130.   Crawl Space Doors' aforementioned statements are material in that the statements influence the purchasing decisions of consumers and construction professionals.

131.   Consumers reasonably rely on Crawl Space Doors' duty to provide non-false information.

132.   Smart Vent has been injured as a result of Crawl Space Doors' acts complained of herein, and there is a likelihood of continued injury to Smart Vent as result of Crawl Space Doors' acts complained of herein.

## Count V
## Federal Trademark Infringement, 15 U.S.C. § 1114

133.   Smart Vent repeats and incorporates by reference the allegations made in the foregoing paragraphs of this Complaint as if fully set forth herein.

134.   Smart Vent has made substantial investments of time, labor, and money to associate its good will and quality products with its trademark.

135.   As a result of Crawl Space Doors' above-described improper conduct and unfair competition, Crawl Space Doors has unfairly deprived Smart Vent of the fruits of its labor, causing damage.

136.   Crawl Space Doors' distribution, marketing, promotion, offering for sale, and sale of goods in connection with the use of the incontestable trademark "SMART VENT", a mark owned by Smart Vent, is likely to cause confusion, mistake, or deception as to the source, affiliation, sponsorship, or authenticity of Crawl Space Doors' goods. As a result of Crawl Space Doors' unauthorized use of trademarks that are identical to and/or confusingly similar to Smart Vent's mark, the public is likely to believe that Crawl Space Doors' goods have been manufactured, approved by, or are affiliated with Crawl Space Doors. Consequently, Smart Vent's ability to gain revenue through the sale of merchandise bearing its mark is limited.

137.   Crawl Space Doors' unauthorized use of the mark falsely represents Crawl Space Doors' website and products as emanating from, or being authorized by Smart Vent, and places beyond Smart Vent's control the quality of products bearing the "SMART VENT" trademark, and the overall message associated with the products bearing the "SMART VENT" trademark.

138.   Crawl Space Doors' infringement of Smart Vent's trademark is willful, intended to reap the benefit of the goodwill of Smart Vent, and violates Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

139.   As a result of Crawl Space Doors' wrongful conduct, Smart Vent has suffered, and will continue to suffer, substantial damages.

140.    Smart Vent is also entitled to injunctive relief pursuant to 15 U.S.C. § 1116(a). Smart Vent has no adequate remedy at law for Defendant's wrongful conduct because, among other items, (a) Defendant's infringement constitutes harm to Smart Vent such that Smart Vent could not be made whole by any monetary award, (b) if Defendant's wrongful conduct is allowed to continue, the public is likely to become further confused, mistaken, or deceived as to the source, origin, or authenticity of the infringing materials, and (c) Defendant's wrongful conduct, and the resulting damage to Smart Vent, is continuing.

**WHEREFORE**, Plaintiff prays for a judgment against Defendant, Crawl Space Doors, and requests that this Court:

1.    Enter a finding and a judgment in favor of Smart Vent and against Crawl Space Doors under 15 U.S.C. §§ 1051-1127, including 15 U.S.C. §§ 1114 and 1125, N.J.S.A. § 56:4-1 *et seq*., and the common law, for unfair competition, infringement and negligent misrepresentation;

2.    Award actual damages, incidental damages, and consequential damages as permitted by law, including punitive and treble damages, pursuant to 15 U.S.C. § 1117, N.J.S.A. 56:4-2, or the common law;

3.    Award all of Defendant's profits or gains resulting from Defendant's willful acts of unfair competition as provided by 15 U.S.C. § 1117, N.J.S.A. § 56:4-2, or the common law;

4.    Award interest, attorneys' fees, costs and disbursements due to the exceptional nature of this case as provided by 15 U.S.C. § 1117, by N.J.S.A. § 56:4-2, or the common law;

5.   Enjoin Defendant, its affiliates, subsidiaries, officers, directors, employees, agents, representatives, licensees, successors and assigns, and all those acting for and on their behalf, or acting in concert with them from further acts of unfair competition and infringement;

6.   Award all further and proper injunctive relief, and all such other relief as permitted by law that this Court deems appropriate; and

7.   Such other relief, at law or in equity as the Court deems just and proper.

## JURY DEMAND

Smart Vent Products, Inc. hereby demands a trial by jury on all issues so triable.

Dated: August 30, 2016              Respectfully submitted,

 s/ Anthony J. DiMarino, III
Anthony J. DiMarino, III, Esq.
Emmett S. Collazo, Esq.
**A.J. DiMarino, P.C.**
41 Grove St.
Haddonfield, NJ 08003
(856) 853-0055

Counsel for Plaintiff,
Smart Vent Products, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I, Anthony J. DiMarino, III, counsel to Plaintiff Smart Vent Products, Inc., hereby certify that the foregoing Amended Complaint, is being electronically filed with the Court on this 30th day of August, 2016.   I further certify that on the 30th day of August, 2016, a true and correct copy of the foregoing document was served via the CM/ECF System on the following:

> Michael N. Onufrak
> Siobhan K. Cole
> 457 Cherry Hill, NJ 08002-2220
> 215-864-7174
> Counsel for Crawl Space Door System, Inc.

> <u>s/ Anthony J. DiMarino</u>
> Anthony J. DiMarino, III
> **A.J. DIMARINO, P.C.**
> 41 Grove Street
> Haddonfield, NJ 08033
> (856) 853-0055
>
> Attorneys for
> Plaintiff Smart Vent Products, Inc.